AARON B. SHUMWAY, ESQ. SBN 15255
NEWMEYER & DILLION LLP
3800 Howard Hughes Pkwy, Suite 700
Las Vegas, Nevada  89169
Telephone: (702) 777-7500
Facsimile: (702) 777-7599
Aaron.Shumway@ndlf.com

Attorneys for Plaintiff
CROWN CASTLE NG WEST LLC

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CROWN CASTLE NG WEST LLC, a Delaware limited liability company,<br><br>    Petitioner/Plaintiff,<br><br>vs.<br><br>CITY OF OREM, a Utah Municipal Corporation; THE CITY COUNCIL OF THE CITY OF OREM; and DOES 1-10,<br><br>    Respondents/Defendants. | CASE NO.:<br><br>PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR:<br><br>Unreasonable Delay – 47 U.S.C. § 332(c)(7)(B)(ii)<br><br>Entitled to Expedited Review –47 U.S.C. § 332(c)(7)(B)(v)<br><br>FILE DATE:<br>TRIAL DATE SET:    No Date Set |

    1.    This case addresses a city's unlawful delay in issuing local approvals for a wireless telecommunications system.  As the Federal Communications Commission ("FCC") declared in 2009, "wireless services are essential to the economic, social and civil lives of 270 million Americans."  In the Matter of Petition for Declaratory Ruling to Clarify Provisions of § 332(c)(7)(B) to Ensure Timely Siting Review, 24 FCC Rcd. 13994 (Nov. 18, 2009), ¶ 3.  The FCC further found that "unreasonable delays in the personal wireless service facility siting applications process have obstructed the provision of wireless service" nationwide. *Id.*, ¶ 34.

2. The City of Orem ("City"), through a pattern of bureaucratic malaise and inaction has refused to take action on a pending permit application submitted by Petitioner and Plaintiff, Crown Castle NG West LLC ("Crown Castle"). Its refusal to act on the pending application results in a prohibition of the provision of wireless telecommunications services, forecloses the ability of Crown Castle to provide critical communications infrastructure to the residences and visitors of the City, and violates the Telecommunications Act of 1996 ("Telecom Act").

3. Crown Castle seeks a declaration of its rights and injunctive relief and/or writ of mandate to direct the City and the City Council of the City of Orem ("City Council") to immediately take any and all actions necessary to expeditiously approve a permit application for the installation of critical telecommunications infrastructure in the City.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337, 2201 and 2202 and 47 U.S.C. § 332.

5. The City and the City Council are subject to the personal jurisdiction of this Court because they are located in this district.

6. Venue is proper in this Court under 28 U.S.C. § 1391(b) in that the City lies in this district and a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

7. Crown Castle properly exhausted all of its administrative remedies prior to bringing this action to the extent it was able -- or required -- to do so. This matter is ripe for review. This case also is timely under 47 U.S.C. § 332(c)(7)(B)(v).

## REQUEST FOR EXPEDITED REVIEW

8. Pursuant to 47 U.S.C. § 332(c)(7)(B)(v), Crown Castle seeks expedited review of this case.

## THE PARTIES

9. Crown Castle, a limited liability company existing under the laws of the State of Delaware and doing business in the State of Utah, is a state regulated telephone corporation. The Utah Public Service Commission ("PUC") granted Crown Castle a "certificate of public convenience and necessity" ("CPCN"). That CPCN certifies Crown Castle as a telecommunications corporation and authorizes Crown Castle to provide public telecommunications services throughout the State of Utah. Pursuant to its CPCN, Crown Castle deploys telecommunications infrastructure for such telecommunications providers as AT&T, Verizon and, in this case, T-Mobile.

10. The City is a municipal corporation existing under the laws of the State of Utah and located within the County of Utah. The City Council is the City's official decision-making body and legislative body. The City Council has quasi-judicial authority to issue approvals of permits and or franchises such as those sought herein. The City and the City Council are required to comply with state and federal laws.

11. Crown Castle is unaware of the true names and capacities of respondents named herein as Does 1 through 10, inclusive, ("Does") whether individual, corporate, associate, or otherwise, and therefore sues those respondents by such fictitious names. The City, City Council and Does collectively are referred to herein as "Defendants."

12. Crown Castle is informed and believes that the Does, and each of them, inclusive, are and were at all relevant times the agents, servants, employees, successors, predecessors, associates, and/or employees of each other and were acting within the course and scope of such relationships and with the full knowledge and consent of each of the other respondents.

## THE TELECOM ACT

13. Congress enacted the Telecom Act "to promote competition and higher quality in American telecommunications services and to 'encourage the rapid deployment of new

telecommunications technologies.'" *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005).  The public policies underlying the 1996 act have become exponentially more urgent and critical in the 21st century.  The following data points underscore that growing urgency:

    a.    In a recent international study, the United States dropped to fifteenth in the world in broadband penetration, well behind South Korea, Japan, the Netherlands and France.  Organization for Economic Co-operation and Development (OECD) Directorate for Science, Technology, and Industry, "Broadband Statistics," (June 2010): <www.oecd.org/sti/ict/broadband>.

    b.    Over 50 percent of all American homes are wireless only.  U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics (Released 05/2017);

    c.    More and more civic leaders and emergency response personnel cite lack of a robust wireless network as a growing public safety risk.  The number of 911 calls placed by people using wireless phones has significantly increased in recent years.  It is estimated that about 70 percent of 911 calls are placed from wireless phones, and that percentage is growing.  FCC (2012) http://www.fcc.gov/guides/wireless-911-services.

    d.    Data demand from new smartphones and tablets is leading to a critical deficit in spectrum, requiring more wireless antennas and infrastructure.  According to a 2011 report, wireless data traffic was 110 percent higher than in the last half of 2010.  Similarly, AT&T reports that its wireless data volumes have increased 30-fold since the introduction of the iPhone.  Executive Office of the President Council of Economic Advisors (White House, Feb. 2012) at 2-6.

    e.    Wireless data traffic grew by a factor of 300 percent between 2010 and 2015.  https://www.ctia.org/industry-data/wireless-quick-facts Global mobile data traffic

is expected to reach a seven-fold increase by 2021. http://digitalconqurer.com/news/cisco-mobile-visual-networking-index-vni-forecasts-seven-fold-increase-global-mobile-data-traffic-2016-21.

14. In furtherance of its goal of facilitating the rapid deployment of telecommunications technologies, the Telecom Act imposes certain restrictions on the land use and zoning authority of local and state governments. Among those restrictions are the following:

   a. State and local governments "shall not unreasonably discriminate among providers of functionally equivalent services." 47 U.S.C. § 332(c)(7)(B)(i)(I).

   b. State and local governments "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." *Id.* § 332(c)(7)(B)(i)(II).

   c. State and local governments "shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time … ." *Id.* § 332(c)(7)(B)(ii).

   d. "Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." *Id.* § 332(c)(7)(B)(i)(iii).

15. If a state or local government takes any actions in violation of the above restrictions, an aggrieved person may bring an action against the governmental entity in a court of competent jurisdiction. Such actions are to be heard "on an expedited basis." *Id.* § 332(c)(7)(B)(v).

**FCC SHOT CLOCK RULE**

16. The Telecom Act itself does not define the "reasonable period of time" within which a local government must take a final action on an application pursuant to 47 U.S.C. § 332(c)(7)(B)(ii). Without a clear rule as to when a failure to take action becomes unreasonable,

wireless service providers had no specific line of demarcation for seeking redress from the courts for local government failures to act on applications in a timely manner.

17.     In 2009, the FCC attempted to remedy this confusion and to address unreasonable delays in the zoning process with the so-called "Shot Clock Rule."  In the Matter of Petition for Declaratory Ruling to Clarify Provisions of § 332(c)(7)(B) to Ensure Timely Siting Review, 24 FCC Rcd. 13994 (Nov. 18, 2009) ("Shot Clock Rule").

18.     The Shot Clock Rule "define[s] what constitutes a presumptively 'reasonable time' beyond which inaction on a personal wireless service facility siting application will be deemed a 'failure to act.'" Shot Clock Rule at 14000, ¶ 19.  The FCC determined that 90 days is "a generally reasonable timeframe for processing collocation applications" and 150 days is "a generally reasonable timeframe for processing applications other than collocations." *Id*. at 14012, ¶ 45. "[I]f state or local governments do not act upon applications within those timeframes," the FCC concluded, "then a 'failure to act' has occurred and personal wireless service providers may seek redress in a court of competent jurisdiction." *Id*. at 14005, ¶ 32.

19.     In 2014, the FCC clarified that the applicable 90-day or 150-day timeline "begins to run when an application is first submitted, not when it is deemed complete." Report and Order, FCC 14-153, WT Docket No. 13-238, ¶¶ 258, 259 (FCC Oct. 17, 2014) ("FCC Report and Order").)

20.     In promulgating the Shot Clock Rule, the FCC recognized that "certain cases may legitimately require more processing time," *Id*. at 14007, ¶ 37.  The FCC provided that the deadlines could be extended by agreement of the applicant. *Id*. at 14013, ¶ 49.  Once the Shot Clock Rule deadline runs, the 30-day statute of limitation set forth at § 332(c)(7)(B)(v) commences.

## FACTS

### The Project

21.     The wireless telecommunications facilities project at issue in this action consists of five small cell antenna "nodes" with supporting electrical equipment ("Project") all located entirely within the public rights-of-way ("PROW") of the City.  Each node comprising the Project integrates with the others to provide a larger wireless telecommunications network within the City.  The Project nodes are distributed throughout the City in a strategic fashion intended to fill critical service gaps in the City.  Each small cell node making up the Project is a "collocation," since it will be located on existing structures in the PROW.

22.     Crown Castle submitted an application for approval of the Project to the City on May 19, 2017, ("Project Application") pursuant to the City's codified procedure for processing and approving applications for wireless telecommunications facilities.

### First Shot Clock Deadline

23.     Because the Project qualifies as a collocation system, the applicable Shot Clock Rule deadline was 90 days from the day the Project Application was first submitted to the City.  Report and Order, ¶¶ 258, 259.  Accordingly, the deadline by which the City was required to act on the Project Application was August 17, 2017 ("First Shot Clock Deadline").

24.     As the First Shot Clock Deadline approached, Crown Castle's representatives observed that the City was making no visible progress on getting the Project Application ready for a timely decision.  Crown Castle's representatives made several inquiries with City staff concerning the progress on the Project Application.  City staff informed Crown Castle that it would have to prepare a "franchise" agreement ("Franchise Agreement") to allow the Project in the PROW.

### Second Shot Clock Deadline

25.     Concerned about the approach of the First Shot Clock Deadline, Crown Castle's

representatives agreed to allow the City more time to prepare the Franchise Agreement and allow the City to take whatever other actions it need to ensure timely action on the Project Application. The City and Crown Castle entered into an agreement dated August 17, 2017, to extend the Shot Clock Rule deadline from August 17, 2017, to October 31, 2017 ("Second Shot Clock Deadline"). As noted above, such extensions are allowed under the Shot Clock Rule. Shot Clock Rule at 14013, ¶ 49.

26. Crown Castle agreed to the Second Shot Clock Deadline in good faith, despite its rights under federal law to have a decision on the Project Application within 90 days of its submittal and despite the fact that time was -- and continues to be -- of the essence in installing the Project, getting the Project "on air," and providing critical telecommunications services to the City.

27. By mid-September 2017, Crown Castle's representatives made several inquiries with the City staff concerning the status of the Project Application. Despite the lapse of significant time after the submittal of the Project Application, the City staff had nothing to show for the passage of time except several basic questions that should have been resolved previously -- or, at a minimum -- much earlier in the process, such as questions concerning the amount of revenue it would require Crown Castle to pay to install the Project in the PROW and whether Crown Castle was required to pay a state license tax. It was clear that City staff still had not made any meaningful progress on the Project Application or the Franchise Agreement and that the City would not be able to meet the Second Shot Clock Deadline.

28. On October 25, 2017, Crown Castle, through its in-house legal counsel, Joshua Trauner, offered to have the City and Crown Castle enter into an interim "placeholder" franchise agreement, based on standard agreements Crown Castle had entered into in other jurisdictions ("Interim Franchise Agreement"). Crown Castle offered the Interim Franchise Agreement in good faith to allow the City to comply with the Second Shot Clock Deadline, without waiver of

the City's right to prepare a more comprehensive agreement which could supersede the Interim Franchise Agreement at a later date.

### No Sign of Any Final Action by the Second Shot Clock Deadline

29.     On October 30, 2017 -- one day before the lapse of the Second Shot Clock Deadline -- the City presented Crown Castle with an entirely new interim franchise agreement, for the very first time ("City Interim Franchise Agreement").  The City Interim Franchise Agreement was replete with unreasonable provisions, including onerous and infeasible fee provisions.  The City Interim Franchise Agreement clearly was a preliminary draft that would require significant time for further negotiations and vetting before it could be executed by the parties.  Moreover, the City sent the City Interim Franchise Agreement to Crown Castle with the caveat that it was a draft and would still require further review by the City Manager and the Assistant City Manager, both of whom were "out" of the office for the week.

30.     On October 31, 2017, the date of the Second Shot Clock Deadline, the City took no final action on the Project Application, giving rise to this action.

### CLAIM FOR RELIEF

**(Violation of 47 U.S.C. § 332(c)(7)(B)(ii) – Unreasonable Delay, against All Defendants)**

31.     Crown Castle incorporates herein by this reference, as though fully set forth, each and every allegation contained above.

32.     The City failed to take any action of any kind on the Project Application by the Second Shot Clock Deadline, as required by § 332(c)(7)(B)(ii) and the Shot Clock Rule.  No ostensive reasonable ground exists for the City's persistent delay.  Indeed, Crown Castle granted the City a 75-day extension of time to allow the City to get its affairs in order and process the Project Application in a manner that allowed it to comply with federal law.  The City's municipal code has required franchise agreements for at least fifteen years; purported delays resulting from compliance with the City's franchise ordinance therefore are facially

unreasonable.  Further, Crown Castle is informed and believes that the City has permitted many other public utilities to install their facilities in the City's PROW over the course of that same period of time.

33.   The City's refusal to act on the Project Application was unreasonable and violates § 332(c)(7)(B)(ii).  Due to the City's unreasonable delay and failure to act, the Project Application remains stuck for the foreseeable future and Crown Castle is thereby prohibited from providing telecommunications services to the City.  This is precisely the kind of the delay the FCC sought to eliminate with the promulgation of the Shot Clock Rule.

34.   A controversy has now arisen between Crown Castle and the Defendants and/or Does 1 through 10, and each of them, in that Crown Castle alleges that the Defendants and/or Does 1 through 10, and each of them, have violated § 332(c)(7)(B)(ii).  It would be fair, just and equitable for the Court to determine such rights between the parties.

35.   Crown Castle has been adversely affected by the above-described violations of law and Crown Castle has a clear right to relief.  The City has a mandatory duty to take action to correct those violations.  Crown Castle has no other adequate relief available to it.  Crown Castle has been adversely affected by the above-described violations of law.  Unless and until enjoined by this Court, Crown Castle will continue to be adversely affected, and Crown Castle has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Crown Castle prays for judgment against Defendants as follows:

1.   For an order declaring the City's delay to be in violation of federal law, specifically 47 U.S.C. § 332(c)(7)(B)(ii), as interpreted by the FCC Shot Clock Rule.

2.   For an order requiring Defendants to take any and all steps necessary to immediately approve the Project Application and to issue any and all necessary land use approvals for the Project.

    3.    For permanent injunctions and/or a writ of mandate compelling Defendants to take any and all steps necessary to immediately approve the Project Application and to issue any and all necessary land use approvals for the Project.

    4.    For attorneys' fees to the extent allowed by federal and/or state law and any other relief deemed appropriate by the Court and for the costs of the suit herein.

Dated: November 30, 2017    NEWMEYER & DILLION LLP

By: *[signature]*
AARON B. SHUMWAY, ESQ. SBN 15255
3800 Howard Hughes Pkwy, Suite 700
Las Vegas, Nevada 89169

Attorneys for Plaintiff
CROWN CASTLE NG WEST LLC